# Exhibit 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF GEORGIA
2                    DUBLIN DIVISION
3    ARIEL CURTIS,                    )
                                      )
4          Plaintiff,                 )
                                      ) Civil Action No.
5      vs.                            )
                                      ) 3:21-cv-15-DHB-BKE
6                                     )
     CORECIVIC, INC., CORECIVIC OF    )
7    TENNESSEE, LLC, THE CITY OF      )
     ALAMO, GA, and CASANDRA BONEY,   )
8                                     )
              Defendants.             )
9    _____
10          REMOTE VIDEOTAPED DEPOSITION OF
11                    ARIEL CURTIS
12   _____
13                 February 7, 2022
14                   10:04 a.m.
15
16          Debra J. Puckett, CCR B1188
17            Certified Court Reporter
18
19
20
21
22
23
24
25

Ariel Curtis                          February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 9

1    BY MR. PETERSON:

2        Q    We will, I will show you that videotape

3    today and many clips from it, and we can walk

4    through it and I'll have various questions about it.

5            Regardless however of your failure to have

6    watched the videotape prior to today's deposition --

7            MR. KASPERS:  Object to form.

8    BY MR. PETERSON:

9        Q    -- you would agree that on the morning of

10   October 4th, I guess it was 2020, on your way to

11   work, you went through the metal detector at the

12   entrance to the Wheeler facility several times.

13           Do you recall that, Ms. Curtis?

14       A    I recall going through that afternoon.  It

15   wasn't that morning.  I went through at 5:30 that

16   afternoon.  On reporting to my shift, yes, sir, I

17   did several go through several times.

18       Q    Thank you for that correction, Ms. Curtis.

19   I appreciate it.

20           So you do remember on the afternoon or

21   evening of October 4th, 2020 as you went to work,

22   you tried to go through the metal detector several

23   times at the entrance to the Wheeler facility.

24           You, you do remember that, right?

25       A    Yes, sir, I do remember going through the

Ariel Curtis
Curtis, Ariel v. Corecivic Inc.                          February 7, 2022

Page 10

1   metal detector.

2       Q    And I think you just referenced that on

3   several times when you attempted to go through the

4   metal detector, it activated.

5            Do you remember that, Ms. Curtis?

6       A    Yes, sir, I do remember activating it

7   several times as I went through.

8       Q    Ms. Curtis, why do you think the metal

9   detector activated on those several occasions when

10  you tried to pass through it?

11      A    I don't know why it activated when I tried

12  to pass through it several times.  I don't work on

13  the metal detector, I just work at the facility.

14      Q    Thank you, Ms. Curtis.

15           Do you contend in your lawsuit that the

16  reason the metal detector activated on the multiple

17  times when you tried to pass through it on that

18  morning was because the metal detector was

19  malfunctioning in some way?

20           MR. KASPERS:  Object to form.  Misstates

21      previous testimony.  It was not the morning.

22  BY MR. PETERSON:

23      Q    Ms. Curtis, do you contend that the metal

24  detector activated on the occasions that you tried

25  to pass through it on the evening of October 4, do

Ariel Curtis                                February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 11

1    you contend it activated because the metal detector

2    was malfunctioning in some way?

3        A    Yes, sir, I do say the metal detector was

4    malfunctioning, because I've seen on numerous

5    occasions the metal detector go off and no one is

6    even going through it.

7        Q    Okay.  Can you identify those occasions?

8    Tell me dates, months, weeks, years.  Can you tell

9    me the numerous occasions which you believe the

10   metal detector went off when no one was even going

11   through it?  Can you identify those times for me,

12   please.

13       A    I don't recall the exact dates at this

14   time, but the year was 2020 when I started working

15   at Wheeler Correctional Facility.  I started in

16   March of 2020.  From about March until October, the

17   metal detectors would go off when we come in.  Where

18   they scan our items through, something could be

19   scanning through there, the metal detectors would go

20   off.  Or if the metal detectors would just go off

21   and no one could be walking through or nothing could

22   be by it.  It would just go off.  As I said, I don't

23   know the exact dates at this time, but it was the

24   year of 2020.

25       Q    Can you give me months on these times when

Ariel Curtis
Curtis, Ariel v. Corecivic Inc.                                February 7, 2022

Page 16

1        Q    And, and that she proceed through the

2   metal detector until she went through it without

3   activating it.

4             Did that make sense to you, Ms. Curtis?

5        A    It made perfect sense to me.

6        Q    Very good.

7             Okay.  I, I may have missed it,

8             Ms. Curtis, I apologize, but did you say

9   there were other times when you saw Officer McLain

10  try to go through the metal detector and it

11  activated?  Did, did you say something along those

12  lines?

13       A    No, sir, I didn't say anything along those

14  lines.  I said that one particular time that I saw.

15       Q    Okay.  Now, notwithstanding that you

16  haven't reviewed the video of the evening of October

17  4 when you walked through the metal detector, do you

18  recall that during the time that you went through

19  the metal detector several times, that there were

20  other people that went through the metal detector

21  during the same time period you were going through

22  it?  Do you remember that?

23       A    I recall two other officers going through

24  before me, because we all walked in together.

25       Q    Do you remember those officers' names?

Ariel Curtis                          February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 17

1        A      I don't recall their names at this time.

2        Q      You would agree with me that the two

3    officers you recall going through the metal detector

4    during that same time period you were going through,

5    you would agree with me that when they went through

6    the metal detector, it did not activate?

7        A      Yes, I would agree with you that when they

8    went through the metal detector, it did not activate

9    it.

10       Q      Why do you think, Ms. Curtis, that the

11   metal detector didn't activate when other officers

12   walked through it, but when you walked through it

13   during the same time period it activated?

14       A      As I stated before, sir, I'm not sure why

15   it activated on me.  I just reported to work.

16       Q      You indicated that you didn't report the

17   metal detector going off without anybody walking

18   through it.

19              Why didn't you report that malfunctioning

20   to anyone, Ms. Curtis?

21       A      I didn't report the malfunctioning

22   incident to anyone else, sir, because I worked in

23   the back.  I reported things of my job.  The front

24   desk officer's job is to report whatever happens in

25   the front.  And I was not the front desk officer.

Ariel Curtis
Curtis, Ariel v. Corecivic Inc.                      February 7, 2022

Page 37

1    myself.  But another officer informed me that the

2    same thing happened the night before.

3         Q    Okay.  Give me just one second, please,

4    Ms. Curtis.

5              MR. PETERSON:  Ms. Court Reporter, I

6         apologize.  Could you read that last question

7         back to me?

8              THE COURT REPORTER:  Yes, sir.  Hang on

9         one second.  Do you want -- oh, I'll just,

10        okay.

11          (The record was read by the court

12        reporter.)

13   BY MR. PETERSON:

14        Q    Okay.  So another way of saying it,

15   Ms. Curtis, is you're not aware, personally aware,

16   of any employee who's ever been allowed access into

17   the Wheeler facility without clearing the metal

18   detector.

19             Do I understand that correctly?

20        A    No, I'm not personally aware.

21        Q    Got it.  Then you mentioned that someone

22   told you about an incident.  Can you tell me about

23   what you're referring to, Ms. Curtis?

24        A    Yes.  Another officer, Officer Garnett,

25   informed me that Lieutenant Corbit tried to access

Ariel Curtis                                February 7, 2022
Curtis, Ariel v. Corecivic Inc.

                                                    Page 44

1        Q     Do you know --

2        A     I don't recall who she was at this time.

3        Q     And do you believe that person was an

4   officer, that is, not a manager or a supervisor,

5   Ms. Curtis?

6        A     Do I believe the person is a officer?

7        Q     Yeah.  The person you can't remember who

8   raised the complaint that you never saw, was that

9   person a non manager?

10       A     Oh, yes.  That person was a correctional

11  officer.

12       Q     Very good.  Okay.

13             Okay.  Back to October 4th.  And you went

14  through the metal detector.  And again, we'll, we

15  can, I can show you the video in full in a minute.

16  But you remember, Ms. Curtis, that you went through

17  the metal detector a couple of times and it

18  activated.  And then Ms. Creamer conducted a, a

19  patdown.

20             Do you recall that?

21       A     Yes, sir, I do recall Ms. Creamer doing a

22  patdown after I went through the metal detector.

23       Q     And, and do you agree that you don't have

24  any problem with Officer Creamer having conducted a

25  patdown of you at that time, do you, Ms. Curtis?

Ariel Curtis                                    February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 45

1        A     No, sir, I don't have a problem with

2   Officer Creamer conducting a pat search of me at the

3   time.

4        Q     Okay.  All right.

5              Now, do you recall that, that after the

6   patdown by Officer Creamer, then you walked through

7   the metal detector again, and once again it

8   activated.

9              Do you remember that, Ms. Creamer -- or

10   Curtis?

11        A     Yes, sir, I do remember that.

12        Q     And then, so after the patdown, you go

13   through the metal detector, it activates again.

14              Do you remember saying anything to Officer

15   Creamer at that time about why you think the metal

16   detector kept going off?

17        A     I remember telling Officer Creamer I'm not

18   sure why the metal detector is going off, I don't

19   have anything on me.  I remember telling Officer

20   Creamer that.

21        Q     And then do you remember Officer Creamer

22   saying well, hold on a minute, just wait, she was

23   going to call Ms. Boney.

24              Do you remember that?

25        A     Yes.

Ariel Curtis
Curtis, Ariel v. Corecivic Inc.

February 7, 2022

Page 51

1    pat search me.  So I got --

2         Q    Very good.  Play it again.

3                   (Video.)

4    BY MR. PETERSON:

5         Q    Ms. Curtis, between the time Ms. Boney

6    directed you to walk back through the metal detector

7    so she could pat search you and this point where I

8    stopped the video, do you recall Ms. Boney saying

9    anything to you?

10        A    Yes.  She told me to bend over as far as I

11   could.

12        Q    Did Ms. Boney tell you why she wanted you

13   to bend over?

14        A    She was going to pat search me.

15        Q    And play the video a little further.

16                  (Video.)

17   BY MR. PETERSON:

18        Q    Okay.  Couple of questions.  You saw that

19   apparently Ms., Ms. Boney did conduct a patdown

20   search of you, right?

21        A    Uh-huh (affirmative).

22        Q    You didn't have any objection to Ms. Boney

23   doing that pat search, did you, Ms. Curtis?

24        A    No, sir, I had no objection at all.

25        Q    Okay.  And as you saw Ms. Boney do the pat

Page 52

```
1   search with you standing upright, you saw that?

2        A    Yes, I did.

3        Q    Well, Ms. Boney didn't pat search you

4   while you were bending over at all --

5        A    -- captain Boney --

6        Q    --

7        A    -- Captain Boney told me to bend over as

8   far I could.  I bent over, and I touched the floor.

9   She came up behind me and then she started and told

10  me to stand up.

11       Q    Okay.

12       A    Uh-huh (affirmative).

13       Q    All right.  Let's watch another couple

14  seconds of the video here, Ms. Curtis.

15                      (Video.)

16  BY MR. PETERSON:

17       Q    There, you saw that Ms. Creamer handed to

18  Ms. Boney a wand.

19            Do you see that, Ms. Curtis?

20       A    Uh-huh (affirmative).

21       Q    And you saw that it looked like there were

22  some words exchanged between Ms. Boney and

23  Ms. Creamer.

24            Do you recall what they said?

25       A    I don't.  I don't recall at this time what
```

Ariel Curtis                                      February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 53

1    they said.

2         Q    And, and do you recall saying anything in

3    this, that, that, that moment we just looked at in

4    the video, Ms. Curtis?

5         A    No, I don't recall saying anything at this

6    time.

7         Q    Okay.  Let me continue.

8                        (Video.)

9    BY MR. PETERSON:

10        Q    All right.  We stopped the video there.

11             Did, in this last clip we just looked at,

12   Ms. Curtis, Ms. Boney's wand searching you, that is,

13   putting the wand in front of you and behind you to

14   see if it activates; is that correct?

15        A    That's correct.

16        Q    And, and do you recall as Ms. Boney passed

17   the wand in, in front of your groin that the wand

18   activated?  Do you recall that, Ms. Curtis?

19        A    No, sir, I do not recall that.

20        Q    Okay.  While Ms. Boney was conducting the

21   wand search, do you recall her saying anything to

22   you or you saying anything to her during that

23   procedure?

24        A    No, sir, I don't recall saying anything at

25   the time.

Ariel Curtis
Curtis, Ariel v. Corecivic Inc.

February 7, 2022

Page 54

1      Q    Am I correct that you don't have any

2    objection to Ms. Boney having performed this wand

3    search of you?  Is that correct, Ms. Curtis?

4      A    That's correct, I have no objection at

5    all.

6      Q    Okay.  At any time on October 4th from the

7    time you came into the facility until the time you

8    left the facility later that evening, at any time

9    did you ever say anything to either Ms. Creamer or

10   Ms. Boney to the effect, something to the effect

11   that maybe the metal detector was being activated

12   because you had diamonds on your underwear?

13     A    No, sir.  From the time I entered the

14   facility until the time I left the facility, I said

15   nothing about underwear.

16     Q    Okay.  And nothing about diamonds on any

17   undergarment?  You never said anything even remotely

18   like that to either Ms. Creamer or Ms. Curtis?

19   Excuse me.

20          You never said anything remotely like that

21   to either Ms. Boney or Ms. Creamer?

22     A    No, sir.  I said nothing remotely to

23   anything about underwear.

24     Q    And if Ms. -- well, let me, let me be

25   crystal clear.

Page 67

1   recall being said between the time you left the

2   facility and the time you got to your vehicle?

3          A     I don't recall anything being said.  When,

4   by the time, from the time we left the facility from

5   the time we got to the vehicle, I don't recall

6   anything at this time being said.  I remember

7   everything being said at the vehicle.

8          Q     Okay.  You got to your vehicle, you

9   unlocked the door to your car, to your vehicle?

10         A     Yes, sir, I did unlock the door to my

11  vehicle.

12         Q     You opened the door and you sat down in

13  the front seat of your vehicle?

14         A     No, sir, I did not sit down in the front

15  seat of my vehicle.  When I opened the door to my

16  vehicle, that's when Captain Boney said pull your

17  pants down.

18         Q     Okay.  So you hadn't, you opened the door

19  to your vehicle, and then Captain Boney said pull

20  your pants down?

21         A     Yes.  I opened the door to my vehicle,

22  then Captain Boney said pull your pants down.

23         Q     And you said what in response to Captain

24  Boney saying pull your pants down?

25         A     That's correct.  I said wait, because I

Ariel Curtis                                    February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 68

1    needed to understand.  I needed to know that she was

2    really telling me to pull my pants down outside.  So

3    I said "what?"

4        Q    What else did you say, if anything, in

5    response to someone telling you to pull your pants

6    down in the parking lot?  Was that all you said,

7    Ms. Curtis?

8        A    Yeah.  I said what, and she said pull your

9    pants down.

10       Q    So Ms. Boney repeated her instruction to

11   pull your pants down.  And what did you say after

12   Ms. Boney repeated her instruction for you to pull

13   your pants down?

14       A    I took my jacket off.  Ms. Creamer grabbed

15   my jacket.  I then said, I did pull my pants down.

16       Q    You then did pull your pants down, is that

17   what you said?

18       A    I did.  Ms. Creamer held my jacket up like

19   she was blocking me, and I did pull my pants down.

20       Q    How far did you pull your pants down?

21       A    I pulled my pants down to my ankles.

22       Q    Okay.  Did you say anything else to

23   Ms. Boney or Ms. Creamer up to this point, between

24   the point that Ms. Boney first told you to pull the

25   pants down and the time you dropped your pants to

Page 69

1    your ankles?  Did you say anything else?

2         A    Other that wait, when I dropped my pants,

3    I had a pad on.  Ms. Creamer said what's that.  I

4    pulled the pad out, gave it to her.  She searched

5    the pad, she saw nothing in it.  I put the pad back

6    between my legs, pulled my pants back up.

7         Q    My question -- thank you, Ms. Curtis.

8    We'll get to what you did.  I just want to make sure

9    I didn't miss anything else that you said.

10             Between the time that Ms. Boney first told

11   you to pull your pants down and the, and the time

12   that you did, in fact, pull your pants down, you

13   don't remember you saying anything else, correct?

14        A    That's correct, I do not recall saying

15   anything else at the time.

16        Q    Got it.  Why didn't you say --

17        A    Why, why didn't I say?

18        Q    Hold on.  Hold, hold on.  I haven't

19   finished the question, Ms. Curtis.

20        A    Oh, okay.  Okay.

21        Q    Why didn't you say anything like no, I'm

22   not, I'm not pulling my pants down outside.  I'm not

23   pulling my pants down.

24             Why didn't you say anything like that?

25        A    I didn't say anything like that, because

Page 75

1        A     That's correct.

2        Q     Why didn't you say anything to Ms. Boney

3   or Ms. Creamer when Ms. Boney told you to pull your

4   pants down, why didn't you say anything to either of

5   them like hey, just to let you know, I'm not wearing

6   any underwear?

7        A     Well, at the time they told me to pull my

8   pants down, I was still shocked that they even told

9   me to pull my pants down.  I shouldn't have to tell

10  them that I don't have on any underwear, because

11  they shouldn't know what is under my clothes at all.

12  Whether I had on underwear, whether I didn't have on

13  underwear.  So no, I didn't think to say I don't

14  have on underwear, because I was still shocked that

15  I was outside and them telling me to pull my pants

16  down.

17       Q     Now, when you pulled your pants down, do

18  you remember Ms. Creamer saying something like well,

19  wow, you're not wearing underwear.  Remember that?

20       A     Yes, I do remember Ms. Creamer saying I'm

21  not wearing underwear.

22       Q     And, and remember Ms. Creamer seemed

23  genuinely surprised that you weren't wearing any

24  underwear, right?

25       A     I'm sure she would be surprised that I

Page 76

1    wasn't wearing underwear, since she had no business

2    knowing what was under my clothes.

3         Q    And, and did, so Ms., Ms. Creamer said oh,

4    you're not wearing underwear or something to that

5    effect, right?

6         A    That's correct.

7         Q    And did Ms. Boney say anything about you

8    not wearing underwear?

9         A    Ms., I don't recall at this time Ms. Boney

10   saying anything.  Ms. Creamer was the one that was

11   --

12        Q    All right.  Let's take a look at another

13   exhibit.  This is a, a statement I think you wrote.

14   Let's see if we can find it.  Plaintiff's e-mail

15   chain now.

16             MS. OLIVER:  This one?

17             MR. PETERSON:  That one, uh-huh.

18   BY MR. PETERSON:

19        Q    So Ms. Curtis.  All right.  Ms. Curtis,

20   this is a, a document we produced in discovery.  Let

21   me walk through it, and then I'm going to, or show

22   it to you and then ask you a couple of questions.

23   And let's go from the bottom up, since it's an

24   e-mail chain.

25             Starting with the last page of this

Ariel Curtis

Curtis, Ariel v. Corecivic Inc.

February 7, 2022

Page 82

1  you pulled your pants down and Ms. Creamer said

2  you're not wearing any underwear, is it correct that

3  you then on your own initiative pulled your pad out

4  and showed it to Ms. Creamer?

5        A    When Ms. Creamer asked what was that

6  between my legs, I then pulled my pad out and gave

7  it to her.

8        Q    Right.

9        A    I didn't, I, I gave it --

10       Q    I just want to be clear.  I just want to

11  be clear.

12            Ms. Creamer didn't direct you to hand her

13  your pad, that's true, isn't it, Ms. Curtis?

14       A    Yes.  When she --

15       Q    All right.  Very good.

16       A    And when she --

17            MR. KASPERS:  Please let the, please let

18       the deponent finish answering your question,

19       Kurt.

20            MR. PETERSON:  I apologize, Tyler.  Ms.

21       Curtis, I apologize to you as well.

22  BY MR. PETERSON:

23       Q    If you were not finished with your answer,

24  please do so.

25       A    Okay.  No, she didn't directly tell me to

Page 83

1   hand her my pad, she asked what was that between my

2   legs.

3        Q    Thank you, Ms. Curtis.

4             Okay.  Did you want Ms. Creamer to feel

5   the pad so that she could determine there was no

6   contraband in them?

7        A    At that point, Mr. Kurt, it didn't matter

8   if she felt it or not, because I was already outside

9   with my bottoms off.  So why not give it to her to

10  feel.  I had already been violated in the worse way.

11  So yes, I gave it to her to feel.  She asked what it

12  was, I gave it to her to feel so she could determine

13  there was no contraband inside of me.

14       Q    We've already gone over in painstaking

15  detail what you said and what Ms. Creamer said.  And

16  Ms. Creamer, according to you, never said anything

17  like hey, I want to feel the pad to make sure

18  there's no contraband in it.  So that's clear,

19  Ms. Creamer never said anything like that.

20       A    No, she never said anything like that.

21       Q    So you wanted her to feel it so she could

22  make darn sure there wasn't anything, no contraband

23  in it.

24            That's why you took off the pad, right?

25       A    I took off the pad not because I wanted

Ariel Curtis                                    February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 84

1   her to feel it, but because I, I just let her feel

2   it so she could determine it was no contraband in

3   there.

4        Q     Did Ms. Creamer take the pad from you?

5        A     Yes, Ms. Creamer did take the pad from me.

6        Q     Walk me through exactly what Ms. Creamer

7   did with the pad.

8        A     I don't have anything here.  But when she

9   took the pad from me, she opened it up, felt it, she

10  said there's nothing in here.  She gave it back to

11  me.

12       Q     Okay.  How long did she spend feeling the

13  pad?

14       A     She didn't spend long.  I mean it was a

15  thin pad, 'cause she didn't have to spend long.  She

16  opened it up, felt the pad and gave it back to me.

17  She, maybe 20 seconds, 15, 20 seconds, if that.

18       Q     And what, if anything, did Ms. Creamer say

19  while she was feeling the pad, if anything?

20       A     I don't recall at this time her saying

21  anything.  After she felt it, she gave it back and

22  said there, there was nothing in it.

23       Q     And then what did you do with the pad?

24       A     I folded it back up and put it back

25  between my legs.

Ariel Curtis
Curtis, Ariel v. Corecivic Inc.                    February 7, 2022

Page 86

1        A    When I learned to write statements, sir,

2    when, when I went out to correctional officer

3    school, I learned to write statements.  They say

4    keep it short and sweet, tell the details that

5    happened, but you don't have to say everything,

6    every small thing that happened.  Keep it short and

7    sweet.  So I done what I was taught to do.  I kept

8    it short and simple.

9        Q    When you pulled your pants down and you

10   had the pad, the pad was covering your, your groin,

11   right?

12       A    That's correct.

13       Q    So until you removed the pad, your groin

14   was covered, correct?

15       A    That's correct.

16       Q    It was only after you removed the pad that

17   your groin was then exposed, correct?

18       A    That's correct.  That's correct.

19       Q    Did you --

20       A    When I removed the pad, my groin was

21   exposed.

22       Q    And, and do you feel, or is it your

23   contention that being, you're having your groin

24   exposed was wrong?

25       A    Sir, I feel that having my butt exposed

Ariel Curtis                              February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 91

1       A    No, I didn't.

2       Q    Can you describe what this pad looks like,

3   looked like?

4       A    It's, I don't know if you know or if you

5   have kids, but if you go to the hospital, you get

6   fishnet underwear and you get long pads.  It's like

7   a, a puppy pad.  You can fold it over, but it's,

8   it's not a puppy pad, it's a pad for women that just

9   had babies or, you know, I had medical issues going

10  on and I chose to wear the pad.  But it, it's, the

11  closest thing I can explain to a man is it's like a

12  puppy pad and you fold it over.

13      Q    Okay.  Got it.

14           Roughly how, how big was this pad?  How,

15  how many inches by how many inches?  Even ballpark,

16  Ms. Curtis.

17      A    I have no idea.  It's, I have a little

18  puppy pad if you want to see the puppy pad.  I can

19  show you a puppy pad.  And --

20      Q    Is it similar in size, Ms. Curtis, and if

21  it's right there handy, that would be great.  I just

22  want to, I just want to get a ballpark idea of how,

23  what the size of the pad was you were wearing.

24      A    Okay.  Let me, let me --

25           THE VIDEOGRAPHER:  Well, if this is a good

Page 95

1   far as the cysts with my body were okay.

2        Q    And has any medical care provider ever

3   directed or suggested that you wear these pads?

4        A    No, they have never suggested that I wear

5   them.  But as a woman, when you have bodily fluids

6   leak out, you don't want them to, in my case, leak

7   out on my pants or in another woman's case leak out

8   on their underwear.  So that was just something that

9   me as a woman knew to do.

10        Q    During 2020 up through at least October

11   4th, how many, how often did you wear those pads

12   when you went to work?

13        A    Every, every day.  Every time I stepped

14   into the facility, I had one on.

15        Q    Got you.  Okay.  Thank you.

16             All right.  So back to your vehicle.  You

17   described for us you got to the vehicle, pulled down

18   your pants, took off the pad, put the pad back on,

19   buttoned your pants back up.  What happened then?

20   So you now get your pants back on.  What, what

21   happened next?

22        A    After I pull my pants back up, Captain

23   Boney then came to the front of my truck.  I stepped

24   to the side, and she just looked in the front -- she

25   didn't do a thorough search.  She just like looked

Ariel Curtis                                   February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 96

1    in the driver seat and on the floor of the driver

2    seat of my truck.

3         Q    Did she say anything while she looked in

4    your vehicle?

5         A    No.  She just looked.  I, me knowing she

6    was probably looking for contraband, but she just

7    looked.

8         Q    And during, while Captain, while Ms. Boney

9    was looking in your vehicle, did you say anything to

10   her?

11        A    No, sir, I did not say anything to her at

12   all.

13        Q    Did Ms. Creamer say anything to anybody

14   while Ms. Boney was looking in your vehicle?

15        A    No, sir, Ms. Creamer did not say anything.

16        Q    Okay.  So now, Ms. Boney looked in your

17   vehicle, then what happens?

18        A    Then --

19        Q    The facility -- I'm sorry to interrupt

20   you, Ms. Curtis.  So walk, eventually you returned

21   back to the facility, it's on the videotape, I'm

22   just trying to get a handle on what happened after

23   now, Ms. Boney looked in your vehicle, walk me

24   through what happens next.

25        A    After Ms. Boney looked in my vehicle, me,

Ariel Curtis                        February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 97

1   Ms. Boney and Ms. Creamer proceeds to walk back to

2   the facility and inside the gates.

3        Q    Okay.  You walked back into the facility.

4   How did you know to walk back into the facility?

5   Who, who said what to whom, or --

6        A    Ms. Boney, Ms. Boney, she was like come

7   on.  And she also took my car keys.

8        Q    I'm trying to figure out what was said.

9   You, I, I, I heard you went back into the facility.

10  How did you all just --

11       A    Ms. Boney --

12       Q    How did you know to get back -- who said

13  what so that you all went back to the facility?

14       A    Captain Boney, after she looked in my

15  truck, she said come on.  And we walked back through

16  the facility, and she said let me have your car

17  keys.

18       Q    Okay.  And then you walk back into the

19  facility, right?

20       A    I, I gave her my car keys as we were

21  walking back to the facility, and we proceeded to

22  walk back into the facility, yes, sir.

23       Q    Oh.  And again, you're trailing off and I

24  am an old man with some bad hearing to begin with,

25  Ms. Curtis.  So if you could speak up just a little

Ariel Curtis                                      February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 98

1  bit louder for me, that would be really helpful.

2      A    After, after she looked in my vehicle, she

3  said come on.  On the way back into the facility,

4  she told me to give her my car keys.  I gave her my

5  car keys as we were walking up to the gate.  I gave

6  her my car keys, then she opened the gate and we

7  proceeded to walk into the facility.

8      Q    Thank you, ma'am.

9           Did you say anything to Ms. Boney during

10 this time period?

11     A    No, sir, I did not say anything to

12 Ms. Boney during this time period.

13     Q    Do you remember Ms. Creamer saying

14 anything during this time period?

15     A    At this time, I do not recall Ms. Creamer

16 saying anything.

17     Q    Okay.  All right.  So you eventually, you

18 get back into the facility, and we'll pull up that

19 video in just a second.

20          Given the description you just gave us

21 under oath, at the time that you left the facility

22 initially, went to your vehicle, we're at your

23 vehicle, you remove your pad, put your pad back on,

24 and then you return to the facility.  You have given

25 a description of those events.

Ariel Curtis                          February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 99

1          It's true that at no point during that

2    entire time did Ms. Boney or Ms. Creamer ever touch

3    you.

4          A     No, they did, they never touched me.

5          Q     Very good.  All right.  Now, let's go back

6    to the video.

7                MR. PETERSON:  Amy, if we can get rid of

8          this, please.  Pull up the video again if you

9          will, please.  Very good.  Thank you.  Bear

10         with us, everybody.  We're pulling up the

11         video.  Hang on for a second here.  All right.

12         Back to the video, everybody.  And move this

13         forward.  Okay.

14   BY MR. PETERSON:

15         Q     Okay.  I'm going to play a clip from the

16   video, Ms. Curtis, and then ask you a couple

17   questions.

18               Ms. Curtis, do you have the video?  Do you

19   have, do you see the video?

20         A     Yes, sir, I see the video.

21         Q     Okay.  All right.  Here we go, Ms. Curtis.

22                         (Video.)

23   BY MR. PETERSON:

24         Q     I'm going to stop the video right there.

25               Ms. Curtis, is this a picture of, of you

Page 102

1          When you walked through the metal detector

2     again in the video clip we just watched, did it

3     activate?

4          A    No, sir.  When I walked through the metal

5     detector the last time, it did not activate.

6          Q    Okay.  Why do you believe the metal

7     detector did not activate this time when it had

8     activated on several other times you tried to walk

9     through it the same day?

10         A    Sir, I honestly don't know why the metal

11    detector didn't react this time.

12         Q    Okay.  So according to you, it went off

13    sometimes, nothing -- strike that.

14              It went off several times when you tried

15    to get through it.  You went to the parking lot, you

16    now go through it and now it doesn't activate.

17    You're not sure why it didn't activate the second

18    time.  I get that.  Perfectly, perfectly fine, Ms.

19    Curtis.

20              Would you agree with me that it's

21    appropriate, it was appropriate for you not yet to

22    be allowed access into the facility, given the

23    inconsistent readings on the metal detector.  You

24    would agree with me that that was appropriate?

25         A    Yes, I agree that it was appropriate for

Ariel Curtis
Curtis, Ariel v. Corecivic Inc.                                February 7, 2022

Page 107

1    open.

2         Q    Got it.  And then you, so you roll your

3    window down, Captain Boney takes your keys.  Then

4    what happens next, Ms. Curtis?

5         A    Captain Boney then walked back into the,

6    into the facility.  I was sitting outside in the

7    car, in the car smoking my Black and Mild.  And I

8    seen a few officers pulled up.  And I saw Officer

9    Garnett pulled up.  So I walked to like the middle

10   of the roadway between my car and her car, because

11   she parked right behind me.  And I was like telling

12   her what was going on, like, man, this is some BS is

13   what I said.  The metal detector kept going off and

14   they told me to go through, but they kept telling me

15   to go through.  And I, when I went back through, it

16   didn't go off.  So I'm not even sure why I'm out

17   here.

18            Officer Garnett then told me (inaudible)

19   that's crazy them doing you like that (inaudible).

20   Lieutenant Corporal, Sergeant Corporal, I can't

21   remember --

22            THE COURT REPORTER:  I'm, I'm so sorry to

23       interrupt.

24            MR. PETERSON:  We, we can't hear you.

25            THE COURT REPORTER:  Yeah.

Page 109

1   returned to the facility.  And then you were

2   describing some conversation you had with Officer

3   Garnett.

4          Just first of all, did I summarize that

5   correctly?

6      A    Yes, sir, that was correct.

7      Q    All right.  At, at some point, Ms. Boney

8   came back to your vehicle after she, you got the

9   keys, rolled down the window, she, she took the

10  keys, she went back in the facility.

11         At some point she does come back to your

12  vehicle, right?

13     A    That's correct, she did come back.

14     Q    Roughly how long was it between the time

15  that she left your vehicle after you rolled down the

16  window, she goes into the facility and back?  How

17  long roughly was that period of time where Ms. Boney

18  was gone?

19     A    Roughly a few minutes.  I don't know the

20  exact, exact minutes, but it was, it was a few

21  minutes.

22     Q    Two to ten, two to five, two to, even --

23  I'm not going to --

24     A    Ooh.  I, I would say maybe two to five --

25     Q    Okay.

Ariel Curtis

Curtis, Ariel v. Corecivic Inc.

February 7, 2022

Page 116

1  know, right there in the parking lot on the -- I'm

2  not sure what it's called, but you park your car

3  right in front of it.  I'm not sure what it's

4  called, but she told me I could sit right there.

5          So I sat down while Officer Zanders was

6  searching my vehicle.  After she got done searching

7  my vehicle, I was like so is there any way that we

8  can go somewhere or you could do a pelvic search on

9  me or anything.  And she said that okay, you can

10  pull your pants down and lay back in your truck.

11          So I pulled my pants down, I laid back in

12  my truck.  She told me to put my legs on the

13  steering wheel.  I put my legs on the steering

14  wheel.  And she put on gloves, and she, she put two

15  fingers inside my vaginal area and she felt up in my

16  vaginal area.  And she was like she's good, she

17  doesn't have any contraband.

18          THE COURT REPORTER:  Okay.  I didn't hear

19      the last part.  "She was like".

20          THE WITNESS:  She said that she's good,

21      she doesn't have any contraband.

22          THE COURT REPORTER:  Thank you.

23  BY MR. PETERSON:

24      Q    And, and thank you, Ms. Curtis.

25          And then what happened?  You pulled up

Page 118

1   same procedures, same regulations.  I asked for her

2   to perform a cavity search on me, because I've seen

3   where officers, they couldn't prove that they had

4   anything on their person or anything, so they would

5   say well, it's inside of them.  So I wanted to X-out

6   all options that they had.

7        Q    Thank you, Ms. Curtis.

8             You're not personally aware of any

9   CoreCivic employee ever having a cavity search

10  performed on them by any other CoreCivic employee,

11  are you, Ms. Curtis?

12       A    No.  A CoreCivic employee cannot cavity

13  search another CoreCivic employee.  The police

14  officer has to cavity search at either the police

15  station or the hospital.

16       Q    Okay.  Got it.  Thank you.

17            Now, you indicated that Officer Zanders

18  conducted a cavity search, you, you had to take your

19  pad off, right?

20       A    That's correct.

21       Q    When you took the pad off, where did you

22  put it?

23       A    I put it in my front seat, in the

24  passenger seat of my car.

25       Q    And then I thought I heard you say you,

Page 124

1   Officer Currie to let her know what was going on,

2   because Officer Currie was not too far from me.  She

3   was in the next city over.  And I was in Alamo.  I

4   don't too much know people that way.

5        Q    Okay.  Did you talk to Officer Currie

6   before or after Officer Zanders allegedly performed

7   a cavity search?

8        A    Before.  I was on the phone with her

9   before, while officer Zanders was looking through,

10   performing the search of my vehicle.

11        Q    Got it.  Okay.  Thank you, Ms. Curtis.

12             All right.  Officer Zanders completes

13   this, the searches you just described.  Walk me

14   through the rest of the sequence of events until you

15   left the facility, Ms. Curtis.

16        A    After she completed the searches, that's

17   when Captain Boney told me to go home, call the

18   investigator the next morning, which would be that

19   Monday morning.  She told me to call, don't return

20   back to work until I talk to the investigator or the

21   warden.

22        Q    Okay.  Got it.  Since October 4th, 2020,

23   have you discussed what happened that day with

24   Officer Boney in any way?

25        A    No, I have not talked to Officer Boney at

Page 132

1       A    No, I haven't talked on social media about

2   what happened.

3       Q    Shifting gears here a little bit,

4   Ms. Curtis.

5            You're not aware of any employee at the

6   Wheeler facility who was ever directed to remove any

7   clothing in connection with any search, are you, Ms.

8   Curtis?

9       A    No, I've never heard about any employee.

10      Q    You're not aware of any employee at the

11  Wheeler facility ever being subject to a cavity

12  search.

13           Is that true, Ms. Curtis?

14      A    Do I know for sure?  No, I haven't heard

15  for sure.  In my training classes that when we first

16  started, they do tell us about some inmate or

17  officer that have been cavity searched.  They have

18  to go to the hospital, or they have to go to the

19  police station.  But as far as me seeing, no, that's

20  something I learned in class.

21      Q    Okay.  Speaking of your training, are, are

22  you aware of any training that you believe

23  Ms. Creamer or Ms. Boney should have gone through

24  with regard to searches but didn't?

25      A    Yeah, I feel like Ms. Boney and Creamer,

Ariel Curtis                         February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 134

1       A    I'm not aware of it.  I know Ms. Boney

2   talked to someone on her phone when she went to the

3   back.  I don't know what was said.  I don't know who

4   she was talking to, but I'm not aware that anyone

5   told her to tell me to pull down my pants.

6       Q    And similarly, you're not aware of anyone

7   directing Ms. Boney to look inside or search your

8   vehicle, correct?

9       A    That's correct.  I'm not aware of anyone

10  telling her to look inside or search my vehicle.

11      Q    And similarly, you're not aware of anyone

12  directing Ms. Boney to tell Officer Zanders to

13  conduct a strip or a cavity search of you, correct?

14      A    Officer, Captain Boney didn't tell Officer

15  Zanders to conduct a cavity or a strip search on me,

16  sir.

17      Q    Okay.  And similarly, you're not aware of

18  anybody directing Officer Boney to tell Officer

19  Zanders to search your vehicle?

20      A    No, sir, I'm not aware of that at all.

21      Q    Okay.  Are you aware of any other instance

22  where police officers were called to the Wheeler

23  facility in connection with an employee attempting

24  to access the facility?

25      A    I know police, when police are called to

Ariel Curtis                    February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 136

1          Does everybody see some pictures?  Does

2     everybody have access, everybody see them?  Do you

3     see them, Ms. Curtis?

4          A    Yes, sir, I see them.

5          Q    Okay.  We produced these pictures in

6     discovery.

7               Do you recognize these signs, Ms. Curtis?

8          A    Yes.  Those are the signs at the front

9     gate telling us no contraband, mostly telling us the

10    rules of the facility.  Have our I.D.

11         Q    Okay.  All right.

12         A    No guns, no weapons, no cell phones.

13         Q    Okay.  And as you saw me scrolling down,

14    here is another set of signs.  They appear to me to

15    be identical.

16              Do you recognize that these signs are

17    posted at the, adjacent to the parking lot at the

18    Wheeler facility?

19         A    Yes, sir, those signs are out there.

20         Q    Okay.  And these, this sign over to the

21    left on this side says at the very bottom right

22    here, any person or motorized vehicle entering

23    beyond this point is subject to being searched,

24    including a search by a drug dog.

25              Do you see that?

Ariel Curtis                              February 7, 2022
Curtis, Ariel v. Corecivic Inc.

Page 137

1       A    Yes, sir.

2       Q    And, and this sign --

3       A    Uh-huh (affirmative).

4       Q    This sign was posted at the parking lot at

5    the Wheeler facility while you were employed there,

6    correct?

7       A    Yes, sir, that sign was posted there when

8    I was employed at the Wheeler facility.

9       Q    As were these signs were posted at the

10    entrance to the Wheeler facility while you were

11    employed there, correct?

12       A    Yes, sir, those signs were posted at the

13    entrance of the Wheeler facility while I was

14    employed there.

15       Q    Very good.  Very good.

16            Changing gears a little bit, and you can

17    get rid of that, Amy.

18            Apart from this lawsuit, Ms. Curtis, have

19    you ever filed any other lawsuits against anyone or

20    any business?

21       A    No, sir, I've never filed a lawsuit

22    before.

23       Q    Have you ever filed any administrative

24    charges, including with the Equal Employment

25    Opportunity Commission or any other administrative