IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

```
ARIEL CURTIS,                    *
                                 *
        Plaintiff,               *
                                 *
    v.                           *        CV  321-015
                                 *
CORECIVIC, INC.; CORECIVIC OF    *
TENNESSEE, LLC; THE CITY OF      *
ALAMO, GA; and CASANDRA BONEY,   *
                                 *
        Defendants.              *
```

———————————

**O R D E R**

———————————

Presently before the Court are two motions for summary judgment filed by Defendant City of Alamo, Georgia and by Defendants CoreCivic, Inc. and CoreCivic of Tennessee, LLC (collectively referred to as ("CoreCivic") and Casandra Boney. The Clerk gave Plaintiff notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. Nos. 65 & 66.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  The matter has been fully briefed and is ripe for adjudication.

## I.  FACTUAL BACKGROUND

In viewing the evidence in the light most favorable to Plaintiff, the relevant facts in the case are as follows.

At all relevant times, Plaintiff Ariel Curtis was a correctional officer at the Wheeler Correctional Facility in Alamo, Georgia. (Defs.' CoreCivic & Boney's Undisputed Fact ¶ 6, see Doc. Nos. 63 & 73.) Defendant CoreCivic operated the Wheeler Correctional Facility under contract with the Georgia Department of Corrections ("DOC"). (Id. ¶ 3.) The Georgia DOC required CoreCivic to establish operational guidelines regarding how to maintain the safety of inmates and correctional officers and to prevent contraband from reaching inmates. (Rule 30(b)(6) Dep. of Amy Garner, Doc. No. 73-3, at 20-21.) CoreCivic's operational procedures were presented to the Georgia DOC prior to their implementation, and the State of Georgia, through the DOC, maintained authority to change any operational procedures as it deemed fit. (Id. at 44-45.) The Georgia DOC had oversight over CoreCivic's management of the Wheeler Correctional Facility. (Id. at 19-20.) In fact, the Georgia DOC maintained a full-time Compliance Officer at the Wheeler Correctional Facility to ensure that the management, policies, and procedures at the facility were being performed in accordance with the standards of the Georgia DOC. (Id. at 40-41.) Every correctional officer at Wheeler Correctional Facility was required by the State of Georgia to take basic correctional officer training. (Rule 30(b)(6) Dep. of

2

Donovan Hamilton, Doc. No. 72-8, at 13, 22-23.)  The Georgia DOC also required all correctional officers to take annual Peace Officer Standards and Training classes, in which they were taught how to perform searches and prevent unauthorized contraband from entering the facility.  (Id. at 16-17, 22-23; Dep. of Sharon Creamer, Doc. No. 67-3, at 24-25, 60.)

Those who entered the property of the Wheeler Correctional Facility, including CoreCivic employees, were notified via signs posted at the entrance to the parking lot and front gate that their person and vehicle were subject to search.  (Undisputed Fact ¶ 7.) Additionally, CoreCivic had an "Entry/Exit" Policy that required all individuals to "clear a metal detector prior to entering the [Wheeler] facility."  (Doc. No. 63-4, § 9-20.4(H)(1).)  Pursuant to the Entry/Exit Policy, anyone who failed to clear the metal detector was to be "pat searched to determine the reason for failure."  (Id. § 9-20.4(H)(7).)  The Entry/Exit Policy defined a "Pat Search" as "[a] search conducted by placement of hands on the individual's clothed body to feel for weapons or contraband." (Id. § 9-20.3.)  If the reason for activation of the metal detector could not be determined, the Entry/Exit Policy required that a shift supervisor be notified. If the shift supervisor was not provided a clear explanation for a person's inability to clear the metal detector, the Entry/Exit Policy authorized the shift supervisor to either deny entry or determine "a need for further action."  (Id. § 9-20.4(H)(7).)  "Further action" could include a

3

pat search, a vehicle search, or a strip search.   (Garner Rule 30(b)(6) Dep. at 56.)   The Entry/Exit Policy also stated that further action would require approval of the Administrative Duty Officer ("ADO").[1]   (Doc. No. 63-4, § 9-20.4(H)(7).)

On October 4, 2020, Plaintiff reported to the Wheeler Correctional Facility to begin an evening shift and walked through the metal detector several times, activating the detector each time.   (Dep. of Ariel Curtis, Doc. No. 70-1, at 9-10.)   At that time, CoreCivic employee Sharon Creamer was working at the front lobby entrance of the Wheeler facility.   (Creamer Dep. at 8-9.) Because Plaintiff repeatedly activated the metal detector, Ms. Creamer performed a pat search of Plaintiff.   (Undisputed Fact ¶ 28.) Ms. Creamer did not find any metal object and directed Plaintiff to walk through the metal detector again.   (Id. ¶ 29.) The metal detector activated again.   (Id. ¶ 30.)   Consequently, Ms. Creamer called her shift supervisor, Defendant Casandra Boney. When Defendant Boney arrived, she asked Plaintiff to walk through the metal detector; the detector once again activated.   (Id. ¶ 33.)   Defendant Boney then pat searched Plaintiff and passed a hand-held metal wand over the outside of Plaintiff's clothing. (Id. ¶ 35.)   The handheld detector indicated there was metal around

---

[1] Another CoreCivic policy entitled "Employee/Volunteer/Contract Staff Searches" provided that CoreCivic employees may not "strip search another employee/volunteer/contract staff without prior approval by the CoreCivic General Counsel (or designee), even if requested to do so by law enforcement personnel."   (Doc. No. 63-5.)

Plaintiff's pelvic area. (Id. ¶ 36.) Plaintiff admits that she had no objection to the searches conducted up to this point. (Id. ¶ 37.)

Defendant Boney then called the ADO, Donovan Hamilton, about the situation. (Id. ¶ 40.) Defendant Boney told Mr. Hamilton that Plaintiff said she had diamonds on her underwear that could be activating the metal detector.[2] (Hamilton Dep., Doc. No. 67-5, at 9; Dep. of Casandra Boney, Doc. No. 67-2, at 27.) Mr. Hamilton told Defendant Boney to have Plaintiff show her the diamonds on her underwear. (Boney Dep. at 38; see Hamilton Dep. at 9.) Mr. Hamilton did not authorize or direct that Plaintiff be strip searched. (Hamilton Dep. at 16.)

Defendant Boney, Ms. Creamer, and Plaintiff then exited the facility and walked to Plaintiff's vehicle in the parking lot.[3] (Undisputed Fact ¶ 49.) Plaintiff then stood in the doorway of her vehicle, removed her jacket, and handed it to Ms. Creamer, who held up the jacket to shield Plaintiff. (Curtis Dep. at 67-68.) Plaintiff lowered her pants at Defendant Boney's direction. (Id.) When she did so, Defendant Boney and Ms. Creamer were surprised to

---

[2] For her part, Plaintiff denies telling anyone that she had diamonds on her underwear. (Curtis Dep. at 54-56.)

[3] The parties dispute why they went to the parking lot. Defendant Boney testified that Plaintiff would only show her the diamonds on her underwear at her vehicle. (Boney Dep. at 28.) Plaintiff has not only denied having told Defendant Boney that she had diamonds on her underwear, she also averred that it was Defendant Boney's decision to go to the parking lot. (Curtis Dep. at 54; Curtis Decl., Doc. No. 72-2, ¶ 2.)

see that Plaintiff was not wearing an undergarment. (Undisputed Fact ¶ 51.) Instead, Plaintiff was wearing a large blue hospital pad over her groin area. (Id. ¶ 53.) Without being told to do so by Defendant Boney or Ms. Creamer, Plaintiff removed the pad from between her legs and handed it to Ms. Creamer so she could examine it for contraband; Ms. Creamer did so and handed it back to Plaintiff, who put it back on. (Curtis Dep. at 69, 82-84.) Defendant Boney then performed a cursory search of Plaintiff's vehicle. (Id. at 95-96.)

Defendant Boney, Ms. Creamer and Plaintiff returned to the front lobby, and Plaintiff walked through the metal detector once more; this time the metal detector did not activate.[4] (Id. at 102.) Though the record does not indicate why, Plaintiff and Defendant Boney returned to Plaintiff's vehicle. (Undisputed Fact ¶ 62.) Defendant Boney then returned to the front lobby alone so she could recharge the cell phone she was using to call Mr. Hamilton. (Boney Dep. at 37.) Plaintiff remained outside of her vehicle because Defendant Boney had taken her car keys. (Curtis Dep. at 97.) According to Defendant Boney, Mr. Hamilton instructed her to call local law enforcement to conduct a pat search of Plaintiff and to search her vehicle. (Boney Dep. at 35.) For his

---

[4] Defendant Boney claims that she did not intend to re-screen Plaintiff and did not observe whether the metal detector activated at that time. (Boney Decl., Doc. No. 63-7, ¶ 3.) Ms. Creamer also did not observe the metal detector at this time. (Undisputed Fact ¶ 59.)

part, Mr. Hamilton testified that he neither recommended a pat
search by law enforcement nor did he tell Defendant Boney to tell
law enforcement that Plaintiff had contraband on her person; rather
he intended for "law enforcement, their practices, protocols, and
policies [to] take over." (Hamilton Dep. at 12.) It is undisputed
that Mr. Hamilton never told Defendant Boney to have law
enforcement perform any strip or cavity search on Plaintiff.
(Undisputed Fact ¶ 67.)

Defendant Boney called and requested an officer be sent to
the correctional facility. (Id. ¶ 68.) Karen Zanders, an officer
from the Police Department of the City of Alamo, arrived a few
minutes later. (Id. ¶ 70.) According to the Incident Report
completed by Officer Zanders, Defendant Boney told her that
Plaintiff had contraband on her person. (Incident Report, Doc.
No. 72-4.) Defendant Boney requested that Officer Zanders perform
a pat search and vehicle search without telling the officer that
she had already performed a pat search of Plaintiff and a search
of her car or that Officer Creamer had conducted multiple pat
searches, all without finding any contraband. (Dep. of Karen
Zanders, Doc. No. 67-1, at 32; see Incident Report.) Officer
Zanders performed a pat search and searched Plaintiff's vehicle,
but she did not locate any contraband. (Undisputed Fact ¶¶ 72,
73.) However, once the officer completed her searches, Plaintiff
asked Officer Zanders to perform a cavity search "to X out all

options they had."[5]  (Curtis Dep. at 116, 118.)  Although Plaintiff "believed" that Officer Zanders would take her into the facility to perform the cavity search (Pl.'s Resp to Def. City of Alamo's St. of Material Facts, Doc. No. 72-1, ¶ 15), Officer Zanders instructed Plaintiff to remove her pants while seated in the driver's seat of Plaintiff's vehicle.  (Curtis Dep. at 116, 165-67.)  In that position, Officer Zanders conducted a cavity search.[6] (Id.)

After this search, Defendant Boney instructed Plaintiff to leave the premises and not return to work until she talked to the investigator or the warden.  (Curtis Dep. at 124.)

On September 16, 2021, Plaintiff filed her Amended Complaint asserting four federal claims brought pursuant to 42 U.S.C. § 1983 and three state law claims.  The federal claims include Counts One and Two, in which Plaintiff alleges that all Defendants (i.e., the CoreCivic Defendants, Defendant Boney, and Defendant City of Alamo) violated her Fourth Amendment rights in seizing her car keys and in performing two vehicle searches, two strip searches

---

[5] To be clear, it is undisputed that Defendant Boney never asked or directed Officer Zanders to conduct a strip or cavity search. Instead, the cavity search was performed upon the request of and with the consent of Plaintiff.

[6] Defendant City of Alamo and Officer Zanders unequivocally deny that Officer Zanders performed a cavity search of any kind on Plaintiff on October 4, 2020, and she does not report having performed one in the Incident Report.  (Zanders Dep. at 46; see Incident Report.)

and a cavity search.[7]   Another § 1983 claim appears in Count Four against Defendant City of Alamo for "Negligent Training" of Officer Zanders.   The last § 1983 claim appears in Count Five against Defendant Boney for "improper deprivation of rights," wherein Plaintiff realleges that Defendant Boney caused the various improper searches and the seizure of her car keys which deprived her of her Fourth Amendment rights.   The state law claims include the following:   negligent training, negligent supervision, negligent retention and failure to implement effective policies against Defendant CoreCivic (Count Three); intentional infliction of emotional distress against Defendant Boney (Count Six); and invasion of privacy against Defendants CoreCivic and Boney (Count Seven).

Through their motions for summary judgment, Defendants seek summary adjudication on all of Plaintiff's claims.

## II.   SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The purpose of the summary judgment rule is to dispose of unsupported claims or defenses, which, as a matter of law, raise no genuine issues of material fact suitable for trial.   Celotex Corp. v.

---

[7] Plaintiff is not allegedly aggrieved by any of the pat searches.

Catrett, 477 U.S. 317, 322—24 (1986).   Facts are "material" if
they could affect the outcome of the suit under the governing
substantive law.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).   A dispute of those material facts "is 'genuine' . .
. [only] if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."   Id.   "The mere
existence of a scintilla of evidence in support of the
[nonmovant's] position will be insufficient" for a jury to return
a verdict for the nonmoving party.   Id. at 252; accord Gilliard v.
Ga. Dep't of Corrs., 500 F. App'x 860, 863 (11th Cir. 2012) (per
curiam).   Additionally, the party opposing summary judgment "may
not rest upon the mere allegations or denials in its pleadings.
Rather, [his] responses . . . must set forth specific facts
showing that there is a genuine issue for trial."   Walker v. Darby,
911 F.2d 1573, 1576—77 (11th Cir. 1990).   As required, this Court
will view the record evidence "in the light most favorable to the
[nonmovant]," Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986), and will "draw all justifiable inferences
in [Plaintiff's] favor."   United States v. Four Parcels of Real
Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal
quotation marks omitted).

### III.   LEGAL ANALYSIS

#### A.   Section 1983 Claims

Section 1983 creates a private right of action for the deprivation of federal rights by persons acting under color of state law. 42 U.S.C. § 1983. Thus, to state a claim for relief under 1983, a plaintiff must show that she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation omitted). Here, Plaintiff alleges her Fourth Amendment right to be free from "unreasonable searches and seizures" has been violated. See U.S. Const. amend. IV. Defendant City of Alamo contends in its motion for summary judgment that Plaintiff cannot show a violation of the Fourth Amendment from the undisputed material facts. Defendants CoreCivic and Boney's motion for summary judgment first focuses on the "color of state law" requirement. Second, they contend that the challenged conduct is not attributable to any CoreCivic policy.

##### 1. As Against Defendants CoreCivic and Boney

The Court will first address the contention that Defendants CoreCivic and Boney's actions were not taken under color of state law. "A defendant acts under color of state law when she deprives the plaintiff of a right through the exercise of authority that she has by the virtue of her government office or position."

11

Butler v. Sheriff of Palm Beach Cnty., 685 F.3d 1261, 1265 (11th
Cir. 2012). A person acts "under color of state law" when she
acts with power "possessed by virtue of state law and made possible
only because she is clothed with the authority of state law." West
v. Atkins, 487 U.S. 42, 49 (1988) (quoted source omitted). Thus,
the dispositive question is whether the defendant was exercising
power she possessed by virtue of some state authority. See Butler,
685 F.3d at 1265.

In a prior Order addressing a motion to dismiss, the Court
found that while Defendants CoreCivic and Boney are private
parties, their conduct constitutes state action because they
perform a function traditionally within the state's purview,
namely operating a correctional facility. (See Order of Sept. 16,
2021, Doc. No. 33, at 7-8 (citing Thomas v. Coble, 55 F. App'x 748
(6th Cir. 2003); see also Rosborough v. Management & Training Corp.,
350 F.3d 459 (5th Cir. 2003) (holding that private prison-
management corporations and their employees may be sued under §
1983 because they are performing a government function
traditionally reserved to the state); Craig v. Floyd Cnty., Ga.,
643 F.3d 1306, 1310 (11th Cir. 2011) ("Georgia Correctional is a
private entity, but '[w]hen a private entity . . . contracts with
a county to provide medical services to inmates, it performs a
function traditionally within the exclusive prerogative of the

state' and 'becomes the functional equivalent of the municipality' under § 1983." (quoted source omitted))).)   In fact, the challenged searches of Plaintiff were conducted by Defendants for penological purposes, i.e., to ensure no person entered the prison with metal or contraband.   (Id. at 8-9.)   Thus, the Court concluded that Defendants were state actors for purposes of the challenged searches of Plaintiff's person and vehicle.   (Id. at 9.)   The Court, however, indicated that Defendant CoreCivic could not be held liable for the alleged misconduct of its employee, Defendant Boney, without evidence that a policy or custom of CoreCivic led to the misconduct.   (Id. at 11.)   Thereafter, Plaintiff filed her Amended Complaint attaching the Entry/Exit Policy with its provision for the shift supervisor to take "further action" as approved by the ADO.   (See Doc. No. 35.)   The Court then denied Defendant CoreCivic's motion to dismiss because Plaintiff had sufficiently linked the alleged misconduct to a CoreCivic policy. (See Order of Oct. 22, 2021, Doc. No. 45.)

Nevertheless, and in contravention of record evidence, Defendants CoreCivic and Boney challenge the "color of state law" requirement of Plaintiff's § 1983 claims at summary judgment.   They contend that Plaintiff's § 1983 claims fail because she cannot show that the challenged searches were taken pursuant to a CoreCivic policy that was "created, required, or directed *by the*

13

*State of Georgia*." (Defs.' Br. in Supp. of Summ. J., Doc. No. 63, at 10 (emphasis in original).)

As stated, the Court has already determined that Defendants CoreCivic and Boney were state actors for purposes of suit under § 1983 by virtue of their performance of traditionally state functions. Indeed, Defendant CoreCivic operated the Wheeler Correctional Facility under contract with the Georgia Department of Corrections, a state entity. The State of Georgia, through the DOC, required operational guidelines concerning the safety of inmates and staff and preventing contraband from reaching inmates; the guidelines were presented to the DOC prior to implementation. The Georgia DOC had complete oversight over CoreCivic's management of the Wheeler Correctional Facility, including maintenance of a full-time Compliance Officer at the facility. Finally, the correctional officers, including Defendant Boney, were required to take basic correctional officer training and post-training, which included search techniques – training which was taught by or in conjunction with the DOC. Thus, the Entry/Exit Policy is state-sanctioned, even state-mandated, and any conduct taken pursuant to the Entry/Exit Policy is indisputably under color of state law.

Surprisingly, Defendants CoreCivic and Boney also contend that there is no evidence that any challenged search (i.e., the strip search of Plaintiff in the parking lot next to her car, the

14

car searches, and the seizure of Plaintiff's car keys[8,9]) was taken pursuant to the CoreCivic policy. The Entry/Exit Policy permits the shift supervisor, i.e., Defendant Boney, to determine if there is "a need for further action" if there is no clear explanation for the activation of the metal detector. Such further action required approval of the ADO. "Further action" could include a pat search, a vehicle search, or a strip search. Defendants contend that the ADO did not authorize any strip search or the seizure of Plaintiff's keys. Yet, in this case, Defendant Boney unequivocally testified that ADO Hamilton told her to have Plaintiff show her the alleged diamonds on her underwear and to search her vehicle. (Boney Dep. at 38.) He also told Defendant Boney to have law enforcement pat search Plaintiff and search her vehicle. (Id. at 35.) In fact, she testified that all of her conduct was pursuant to ADO Hamilton's instruction. (Id. at 61-62.) To the extent this is true, Defendant Boney's conduct in searching Plaintiff's person in the parking lot, performing a brief

---

[8] There is no evidence that anyone at CoreCivic or Defendant Boney authorized or directed Officer Zanders to perform the alleged cavity search; thus, Defendants CoreCivic and Boney cannot be held liable for the indignities of that search.

[9] Plaintiff counts the physical search by Officer Zanders as two searches: a cavity search, and a "strip search" since she took off her pants. However, this search was conducted all at once upon Plaintiff's request and consent. And, again, no part of the search was directed or requested by Defendants CoreCivic or Boney.

15

vehicle search, directing Officer Zanders to do the same, and even seizing Plaintiff's car keys was directed by an ADO pursuant to policy.

Defendants attempt to parse the definition of "strip search." They point out that no one authorized a strip search, which is defined under the Entry/Exit Policy as "[a] search of an individual that requires all clothing be removed." (Doc. No. 63-4, § 9-20.3 (emphasis added).) The Court will not countenance a strict adherence to that definition; the exposure of a person's genital area while her shirt is on certainly falls within the realm of a strip search. Defendants also contend that Plaintiff *voluntarily* pulled down her pants without any underwear, a fact that they knew nothing about. But this contention ignores the testimony of Plaintiff that she was told to lower her pants by Defendant Boney. (See Curtis Dep. at 67-68.) And while this is not a strip search within the definition of the Entry/Exit Policy, a reasonable jury could find the instruction unreasonable regardless of whether Plaintiff was wearing underwear. In short, there are genuine disputes of material fact with respect to the manner in which the strip search was conducted (see n.3, supra, discussing the parties' dispute as to why they went out to the public parking lot) and the extent of authority ADO Hamilton gave to Defendant Boney, who in turn directed the action of Officer Zanders. A jury needs to hear

16

the conflicting accounts of what transpired that day and determine whether Defendants' conduct was pursuant to its Entry/Exit Policy and whether their conduct was reasonable under the circumstances. Accordingly, Defendant CoreCivic and Boney's motion for summary judgment on Plaintiff's § 1983 claims for violations of her Fourth Amendment rights is denied.

   2. As Against Defendant City of Alamo.

   There is no liability under § 1983 through *respondeat superior*. Instead, "[a] municipal actor may be liable under § 1983 only if it causes the alleged constitutional violation through the implementation of an official policy or an unofficial but pervasive and well-settled custom or practice." Watkins v. Willson, 824 F. App'x 938, 941 (11th Cir. 2020). A municipal actor may also be liable under § 1983 for the failure to provide adequate training to its police officers "if the deficiency evidences a deliberate indifference to the rights of its citizens." Id. "To proceed under a failure-to-train theory, a plaintiff ordinarily must show a 'pattern of similar constitutional violations by untrained employees' because '[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.'" Id. (quoting Connick v. Thompson, 536 U.S. 51, 62 (2011)).

17

In this case, Plaintiff has failed to produce any evidence that would satisfy the rigorous standards announced above. Plaintiff has not shown that Officer Zanders' allegedly unconstitutional conduct was taken as part of an official policy or that her conduct was part of an unofficial but pervasive and well-settled custom or practice of the City of Alamo police department.   Thus, even if Officer Zanders violated Plaintiff's constitutional rights in her search of Plaintiff's vehicle and person, the City of Alamo is not liable.

Moreover, Plaintiff's § 1983 failure to train claim in Count Four is unsupported by the evidence.   There is no evidence that Officer Zanders' training in search techniques was constitutionally infirm or that some failure in her training amounted to deliberate indifference on the City of Alamo's part. See Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) ("'Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality . . . can a city be liable for such failure under § 1983."   To establish a 'deliberate or conscious choice' . . . , a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." (quoted and cited sources omitted)). Plaintiff has presented no evidence that there had been any prior

problems, any prior complaints, or any prior alleged constitutional violations by Officer Zanders or any other officer of the City of Alamo police department related to searches. Accordingly, Defendant City of Alamo is entitled to summary judgment on Plaintiff's § 1983 claims related to Officer Zanders' search of her person and vehicle.

At this juncture, the Court is constrained to comment on the admissibility of the searches conducted by Officer Zanders as against Defendants CoreCivic and Boney at trial. Plaintiff points out that Officer Zanders would not have performed any search had it not been for CoreCivic employees falsely telling Officer Zanders that Plaintiff had contraband on her person and that she refused to be searched, and by failing to tell Officer Zanders that Plaintiff had already been pat searched and strip searched prior to her arrival. This may be true of Officer Zanders' pat search and vehicle search. Indeed, Officer Zanders testified that she believed she had reasonable cause to search because of what was told her by the CoreCivic employees. (See Zanders Dep. at 33-34, 40-42, 56-57; Incident Report.) But with respect to the cavity search, it is undisputed that no one – particularly no one with CoreCivic - asked Officer Zanders to perform it *except Plaintiff*. The cavity search was performed at the request of and with the consent of Plaintiff. Thus, there can be no liability against

19

Defendants CoreCivic and Boney related to the alleged cavity search. For this reason, no evidence related to the alleged cavity search will be admitted in the trial of this case.

### B. State Law Claims

The state law claims have been asserted against Defendants CoreCivic and Boney, not the City of Alamo. Defendants CoreCivic and Boney seek summary judgment on all state law claims.

### 1. Negligent Training, Negligent Supervision, Negligent Retention, and Failure to Implement Effective Policies.

In Count Three of the Amended Complaint, Plaintiff alleges that Defendant CoreCivic "failed to implement and enforce procedures needed to ensure the constitutional validity of searches of individuals on CoreCivic's property." However, there is no evidence (or even argument past this singular allegation) that any improper search was the result of a failed policy or procedure.

Plaintiff also alleges that Defendant CoreCivic should not have allowed Defendant Boney to be in a supervisory position able to conduct searches when it knew or should have known of her propensity to harass co-workers. In this regard, Plaintiff presents evidence that a *2003* evaluation of Defendant Boney showed that she "[m]ight have problems relating to or supervising others to the degree required by the job." (Pl.'s Resp. to Mot. for Summ.

J., Doc. No. 73, Ex. 5.)  Also, Plaintiff submits the disciplinary record of Defendant Boney, which shows that she had been disciplined for failing to follow directives and being disrespectful to her subordinates; however, these notices came **after** the subject incident.  (See Defs.' Reply Br., Doc. No. 79, Ex. B.)  Moreover, none of the incidents relate in any way to searches of co-workers or subordinates.

In Georgia, a claim of negligent retention, training, or supervision requires the plaintiff to produce evidence of incidents similar to the behavior that was the cause of the injury at issue.  See Edwards v. Comtrak Logistics, Inc., 2014 WL 11820247, at *9 (N.D. Ga. Mar. 5, 2014) ("'An employer may be held liable for negligent supervision only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behaviors relevant to the injuries allegedly incurred by the plaintiff.'" (quoting Leo v. Waffle House, Inc., 681 S.E.2d 258, 262 (Ga. Ct. App. 2009))); Jane Doe No. 1 v. Fulton-DeKalb Hosp. Auth., 2007 WL 3027393, at *5 (N.D. Ga. Oct. 12, 2007 ("Georgia's courts have held that negligent supervision and retention is demonstrated 'only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's "tendencies" to engage in certain behavior relevant to

the injuries allegedly incurred by the plaintiff.'" (quoted source omitted)).

Plaintiff in this case has presented no evidence that Defendant CoreCivic would have any reason to suspect that Defendant Boney would engage in constitutionally infirm searches. Accordingly, summary judgment is appropriate on this state law claim.

2.  Intentional Infliction of Emotional Distress.

In Count Six, Plaintiff alleges that Defendant Boney intentionally inflicted emotional distress upon her. In Georgia, liability for the tort of intentional infliction of emotional distress attaches "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Bowers v. Estep, 420 S.E.2d 336, 339 (Ga. Ct. App. 1992) (quoted source omitted). A plaintiff must show that the defendant's actions "were so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff." Ga. Power Co. v. Johnson, 274 S.E.2d 17, 18 (Ga. Ct. App. 1980). Setting aside the alleged cavity search of Plaintiff by Officer Zanders, as we must, Plaintiff has failed to describe any conduct by Defendant Boney that was so outrageous and of a character that goes beyond all possible bounds of decency.

Further, there is no evidence that Plaintiff suffered severe emotional distress as a result of the subject incident. See, e.g., Plantation at Bay Creek Homeowners Ass'n v. Glasier, 825 S.E.2d 542, 551 (Ga. Ct. App. 2019) (explaining that a plaintiff must show that the "distress inflicted [was] so severe that no reasonable person could be expected to endure it" (quoted source omitted)); Abdul-Malik v. AirTran Airways, Inc., 678 S.E.2d 555 (Ga. Ct. App. 2009) (summary judgment granted on intentional infliction claim in the absence of evidence of extreme emotional distress). Here, Plaintiff only states at deposition that at the time of pulling her pants down in the parking lot, she felt "violated in the worse way." (Curtis Dep. at 83.) She presents no evidence, however, that she suffered severe distress from the incident. Thus, summary judgment is appropriate on this state claim.

### 3. Invasion of Privacy.

Plaintiff's invasion of privacy claim in Count Seven is asserted against Defendants CoreCivic and Boney. Plaintiff alleges that she had a right to privacy of her person and vehicle, which was violated by Defendant Boney's searches. The invasion of one's right to privacy is actionable in tort in Georgia if it "involves an unreasonable and highly offensive intrusion upon another's seclusion." Summers v. Bailey, 55 F.3d 1564, 1566 (11th

Cir. 1995). "With regard to this type of invasion of privacy, the Supreme Court [of Georgia] has held that the unreasonable intrusion aspect involves a prying or intrusion, which would be offensive or objectionable to a reasonable person, into a person's private concerns." <u>Association Servs., Inc. v. Smith</u>, 549 S.E.2d 454, 458 (Ga. Ct. App. 2001) (cleaned up). Here, the Court concludes that genuine disputes of material fact exist as to whether Defendant Boney's conduct in searching Plaintiff in the parking lot, searching her vehicle, and causing Officer Zanders to do the same, was reasonable under the circumstances. Further, genuine disputes of material fact exist as to whether Defendant Boney's conduct was directed by Defendant CoreCivic. In short, summary judgment is not warranted on this claim.

## IV.   CONCLUSION

Upon the foregoing, Defendant City of Alamo's motion for summary judgment (doc. no. 62) is **GRANTED**. The Clerk is directed to **TERMINATE** the City of Alamo from the case and **ENTER JUDGMENT** in its favor and against Plaintiff.

Defendants CoreCivic and Boney's motion for summary judgment (doc. no. 63) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Plaintiff's state law claims of negligent supervision/retention (Count Three) and intentional infliction of emotional distress (Count Six) are dismissed. The case will proceed to trial on

24

Plaintiff's § 1983 claims against Defendant CoreCivic and Defendant Boney (Counts One and Two) as well as her state law claim for invasion of privacy (Count Seven).

**ORDER ENTERED** at Augusta, Georgia, this /3th day of March, 2023.

_____
UNITED STATES DISTRICT JUDGE

25